IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TIMOTHY E. VUYANICH, *et al*,

　　　　　　*Plaintiffs*,

　　v.

SOUTH HUNTINGDON TOWNSHIP, *et al*,

　　　　　　*Defendants*.

Civil Action No. 2:19-cv-1342

Hon. William S. Stickman IV

## <u>MEMORANDUM OPINION</u>

WILLIAM S. STICKMAN IV, United States District Judge

　　　　Plaintiffs Timothy E. Vuyanich ("Mr. Vuyanich") and Carol L. Vuyanich (collectively "Plaintiffs") treated their property, which is partially situated in Smithton Borough and partially situated in South Huntingdon Township, as a junkyard. It ultimately resulted in a criminal misdemeanor conviction against Mr. Vuyanich. After authorization by a Pennsylvania state court judge, Smithton Borough and other affiliated entities cleaned up Plaintiffs' property by hauling away vehicles and other items. Plaintiffs filed suit asserting a number of claims that various defendants wrongly entered their property and removed chattels. (ECF No. 1). The Defendants remaining in the case are South Huntingdon Township, Supervisor Eddie Troup ("Troup"),[1] Supervisor Matthew Jennewine ("Jennewine"), and Supervisor Richard Gates ("Gates")

---

[1] Plaintiffs have admitted that Troup was not a South Huntingdon Supervisor on September 27, 2019, that he did not enter their property on September 27, 2019, and that they mistakenly named him as a defendant in this case. (ECF No. 135, p. 13); (ECF No. 149, p. 23). Therefore, as to the claim against Eddie Troup contained in Count IV, summary judgment will be entered in favor of Troup and against Plaintiffs.

(collectively the "South Huntingdon Defendants").[2]  The South Huntingdon Defendants filed a

Motion for Summary Judgment requesting that the Court enter judgment in their favor and against

Plaintiffs as to the claims against them contained in Counts I and IV of Plaintiffs' complaint. (ECF

No. 131).  Count I asserts a Fourteenth Amendment procedural due process claim against South

Huntingdon Township, and Count IV asserts a Fourth Amendment unreasonable search claim

against all of the South Huntingdon Defendants. (ECF No. 1).  Plaintiffs filed a Partial Summary

---

[2] On November 2, 2022, Plaintiffs entered a stipulation of dismissal of Smithton Borough, Chief Michael R. Natale and Patrolman Ralph R. Marsico, Jr. ("Smithton Defendants") with prejudice. (ECF No. 102).  The Court approved the stipulation of dismissal on November 3, 2022, and the Smithton Defendants were dismissed with prejudice.  (ECF No. 103).  The Release states in pertinent part:

> In consideration of the cash consideration paid to Plaintiffs and the mutual covenants contained herein, Plaintiffs do hereby remise, release, and forever discharge, and by these presents, do for themselves, their successors, assigns, heirs, guardians, administrators, executors and all other persons, firms or corporations claiming through them, remise, release, and forever discharge Releasees, together with their respective past, present and future officers, elected and appointed officials, attorneys, agents, servants, representatives, employees, predecessors, and successors in interest and assigns, insurers, from any and all past, present, or future claims, demands, obligations, actions, causes of action, rights, damages, costs, counsel fees, expenses, and compensation of any nature whatsoever, whether based on tort, contract, or other theories of recovery and whether for compensatory or punitive damages or for equitable relief, which the Plaintiffs now have or which may hereafter accrue or otherwise be acquired on account of or in any way growing out of the subject of the Lawsuit (and all related events), including without limitation any and all known or unknown claims for alleged violations of civil or constitutional rights and for injuries or damages to Plaintiffs and the consequences thereof, which have resulted or may result from alleged negligent, reckless or intentional acts or omissions of the Releasees or their agents up to and including the date of this Release. This Release shall be fully binding upon the Plaintiffs and all parties represented by or claiming through them.

(ECF No. 138, KK, LL); (ECF No. 135, pp. 14-15); (ECF No. 149, p. 25); (ECF No. 111-1).  It goes on to state, "Plaintiffs, by executing this Agreement, are not releasing any rights or causes of action against the following individuals: South Huntingdon Township; South Huntingdon Township Supervisors Eddie Troup, Matthew Jennewine, Richard Gates, […]." (ECF No. 111-1, p. 2).

Judgment Motion only as to liability on their Fourteenth Amendment procedural due process claim against South Huntingdon Township (Count I).  (ECF No. 139).  For the reasons set forth below, the Court will grant the South Huntingdon Defendants' motion and deny Plaintiffs' motion.

## I.     FACTUAL HISTORY

Plaintiffs' property, located at 303 Third Street, Smithton, Pennsylvania 15479, is partially situated in Smithton Borough and partially situated in South Huntingdon Township.  Only seven percent of the property is in Smithton Borough, but that is the part adjacent to and connected to Third Street in Smithton Borough.  Thus, all of Plaintiffs' neighbors are Smithton residents. Plaintiffs treated their property as a junkyard,[3] and since 2002 they were subjected to numerous ordinance actions and/or private criminal complaints pursued by South Huntingdon Township. (ECF No. 135, p. 3); (ECF No. 149, p. 3); (ECF No. 141, p. 1); (ECF No. 146, p. 1).  At some point, South Huntingdon Township stopped pursing actions related to Plaintiffs' property.  (ECF No. 135, p. 4); (ECF No. 149, p. 3).  Smithton Borough also received frequent complaints about the state of Plaintiffs' property, and Smithton Police Chief Michael R. Natale ("Chief Natale") was made aware of the issues with Plaintiffs' property during his orientation in 2014.  In the course of six to eight years, Smithton Borough pursued approximately fifty court actions against Plaintiffs. (ECF No. 135, p. 4); (ECF No. 149, p. 4).

---

[3] Plaintiffs take issue with the term "junk" with respect to the material on their property. Undisputed photographs of the material show that it consisted of numerous objects including automobiles, appliances, tires, scrap metal, cinder blocks, building materials, trash, and other objects, all exposed to the weather and in various states of decay and disrepair.  The United States Court of Appeals for the Third Circuit referred to the property as a "junkyard."  (ECF No. 55-1). The Court will also use this term "junk," keeping in mind that one man's junk is another man's treasure and that the characterization of the material as "junk" is not legally dispositive.

On February 29, 2016, Smithton Borough's Solicitor, Blaine Black ("Solicitor Black"), wrote to South Huntingdon Township's Solicitor, Christopher Huffman ("Solicitor Huffman"), regarding Plaintiffs' property, and advised:

> Smithton Borough would like to prosecute the property owner for various violations of its Ordinances since he refuses to move junk and other debris from the property. We are requesting that South Huntingdon Township relinquish any jurisdiction over to Smithton Borough for such Ordinance violations. Smithton Borough is willing to handle any and all prosecution and code enforcement relating to this property at no cost or expense to South Huntingdon Township. Currently, Smithton Borough Police Department is charged with the enforcement of its Ordinances. However, Borough Council is considering the hiring of a private code enforcement company to handle enforcement.

(ECF No. 138-7); (ECF No. 135, pp. 4-5); (ECF No. 149, p. 5); (ECF No. 141, p. 2); (ECF No. 146, pp. 2-3). At a South Huntingdon Township meeting on March 17, 2016, attended by South Huntingdon Township Supervisors Troup, Gates, and William Sherbondy ("Sherbondy"), Solicitor Huffman was authorized to send a letter to Solicitor Black. More specifically, the following was recorded in the meeting minutes:

> William Sherbondy made a motion to have Chris Huffman send a letter to Smithton Borough [ ] to file charges against Carol and Tim Vuyanich. Richard Gates seconded. Eddie Troup, Richard [ ] [,] William Sherbondy all voted yes.

(ECF No. 138-8, p. 2).[4] Solicitor Huffman then sent a March 18, 2016 letter to Solicitor Black stating in pertinent part,

> Please be advised that the South Huntingdon Township Supervisors have approved your request that South Huntingdon Township relinquish jurisdiction over to Smithton Borough for prosecution of any South Huntingdon Township Ordinance and/or Code violation which may occur on the portion of the [Vuyanich] property that is located in South Huntingdon Township. This letter shall serve as official notification that South Huntingdon Township is granting Smithton Borough the

---

[4] The quality of this exhibit is such that portions of it are missing on the right side of the page. (ECF No. 138-8, p. 2). Solicitor Huffman clarified during his deposition testimony that under the Second Class Township Code, the supervisors were not required to keep detailed minute records. To the extent minutes existed, they were the township secretary's interpretation of what was said. (ECF No. 138-29, pp. 7-8).

right to enforce and prosecute any violation of South Huntingdon Township ordinance or code as it relates to the [Vuyanich] property.

(ECF No. 138-9, p. 2).  And, according to Solicitor Huffman, he wrote the letter to notify Smithton Borough that it could pursue its own ordinance efforts, but South Huntingdon Township did not want to be involved.  (ECF No. 138-29, pp. 5-12).  He did not believe it was an inter-municipal cooperation agreement.  (ECF No. 138-29, p. 13).  According to Solicitor Black, he did not request South Huntingdon Township relinquish jurisdiction over all portions of the property; he was simply seeking to enforce violations of the Smithton Borough code on the portion of the property in its jurisdiction.  (ECF No. 147-1, pp. 3, 5-8).

A criminal complaint was filed against Mr. Vuyanich in a state court before a magisterial district judge at Complaint/Incident Number 20180702M0010 with Chief Natale as the affiant. (ECF No. 138-10).  Mr. Vuyanich was charged with three separate offenses: public nuisance, in violation of 18 Pa.C.S.A. § 6504; abandonment of vehicles, in violation of 75 Pa.C.S.A § 3712(B) (5 counts); and discarding an icebox in a place accessible to a child, in violation of 18 Pa.C.S.A. § 6502(A).  (ECF No. 138-10).  None of these criminal charges related to any violations of South Huntingdon Township's ordinances.  Rather, they all dealt with violations of Smithton Borough ordinances.  (ECF No. 135, p. 6); (ECF No. 149, p. 10).  The case was held over for further proceedings in the Court of Common Pleas of Westmoreland County at Docket Number CP-65-CR-0003869-2018. (ECF No. 142-14); (ECF No. 141, p. 3); (ECF No. 146, p. 4).  Five status conferences were held before Judge Feliciani, and none were attended by any representative of South Huntingdon Township.  During the January 10, 2019 status conference, the Westmoreland County assistant district attorney stated that she was attempting to obtain a monetary grant to assist Mr. Vuyanich with cleaning the property, and she requested a continuance of ninety days to confirm that Plaintiffs were taking steps to clean the property.  At an April 9, 2019 status

conference, Mr. Vuyanich's attorney explained that Mr. Vuyanich was incapable of cleaning the property himself and that he was willing to cooperate. Judge Feliciani continued the case for another sixty days on the condition that Mr. Vuyanich, "with whatever help he's getting, will abate the problem that's persisted since 2014 or earlier." (ECF No. 135, p. 7); (ECF No. 149, p. 10). At a June 18, 2019 status conference, Judge Feliciani recognized that Smithton Borough had been trying to get the property cleaned "for months, if not longer." Judge Feliciani ordered that Mr. Vuyanich had twenty days to remove any items he wanted to keep from his vehicles, and after the twenty days expired, Smithton Borough was authorized to remove the vehicles "or whatever else is on the property." Judge Feliciani also issued a written order following the conference authorizing Smithton Borough to clean the property. (ECF No. 135, p. 8); (ECF No. 149, p. 12); (ECF No. 138-14).

The cleanup of Plaintiffs' property commenced in July 2019. It involved Smithton Borough's cleanup contractor, Dale Cooper ("Cooper"), and several of his crewmembers. (ECF No. 135, p. 8); (ECF No. 149, p. 15). Cooper agreed to remove abandoned vehicles, cleanup garbage and take "all metals and items" off Plaintiffs' property for $3,500.00. (ECF No. 141, p. 3); (ECF No. 146, p. 4). Smithton Borough emailed Chief Natale on July 2, 2019, to inform him that Cooper was "good to go with the clean-up" and that Cooper had "found someone that will take the cars and was able to line up helpers." (ECF No. 150-19); (ECF No. 141, p. 6); (ECF No. 146, p. 8).

From July 9, 2019 through October 3, 2019, Cooper was at the property cleaning for approximately thirty days. He removed numerous vehicles and other garbage/junk from the property. None of the removed items were inventoried. During the process, the property line between the two municipalities was unclear to some individuals and Cooper's crew may have

entered a portion of the property in South Huntingdon Township and cleaned up some items.  The South Huntingdon supervisors did not personally participate in cleaning up and removing chattel from Plaintiffs' property.  (ECF No. 135, pp. 8-9); (ECF No. 149, pp. 15-18); (ECF No 141, pp. 6-7); (ECF No. 146, p. 9); (ECF No. 152, pp. 2-5).

In August 2019, Solicitor Black sent Solicitor Huffman a letter that provided an update as to the activities on the criminal prosecution of Mr. Vuyanich, as well as the cleanup operations at Plaintiffs' property.  Further, Smithton Borough wanted to know if South Huntingdon Township "would be willing to meet with Smithton and the Solicitors to discuss dealing with the Vuyanichs in the future."  (ECF No. 150-37, p. 2); (ECF No. 149, p. 19).  In a September 9, 2019 email, Chief Natale explained to Plaintiffs' counsel, Solicitor Black, the assistant district attorney assigned to Mr. Vuyanich's criminal case, and Smithton Borough what had occurred on the portion of Plaintiffs' property in Smithton Borough – i.e., the removal process for the vehicles and  what had been done with cleanup – and that the intention of the criminal proceeding was not to send Mr. Vuyanich to jail, but to remediate a "public nuisance and health hazard," and that Plaintiffs should bear the cost of the cleanup.  (ECF No. 150-30, p. 2).  The email also included an update as to South Huntingdon Township:

> The only outstanding detail other than what I have described above is with the portion of the Vuyanich property in South Hunting[d]on Township, which is covered with filth and junk similar to the portion in the Borough of Smithton.  The Borough has received a letter from the Township and their solicitor, Christopher Huffman, authorizing the Borough and the Police Department to pursue remediation of the blight on the Township side as well as the Borough side.  However, the Borough is unwilling to front the money to the contractor and seek to have it reimbursed, and there is some question about whether that is able to be done under Township codes. Regardless, the Township is interested in pursuing the matter one way or another.   They have asked the Borough's contractor to provide an estimate for the cleanup of the Township side of the property, and they may choose to pursue a similar course either by tacking themselves on to the current criminal and civil proceedings if possible, or by pursuing a separate action. Right now this does not affect my [sic] and my prosecution of this matter; I only mention it in the interest of keeping all parties informed of all aspects of the situation. It may play into the discussions that we are having and the resolutions that we propose,

or it may not.

(*Id.* at 3).

Near the end of the cleanup operation, Chief Natale contacted the South Huntingdon Township supervisors to inquire if they would be interested in using Cooper to clean up the South Huntingdon Township portion of the property.  The South Huntingdon Township Supervisors – Jennewine, Gates, and Jeffrey Seglowich ("Seglowich") (collectively, the "Supervisors") – decided to visit Plaintiffs' property and did so on September 27, 2019.  They walked over a trail/driveway connected to Walnut Lane, a public road, and stood near Plaintiffs' shed/chicken coop for fifteen to twenty minutes.  It was approximately fifty to seventy-five yards from the dwelling and separated by a barrier of what can only be characterized as junk.  Plaintiffs contend that the Supervisors walked to an area behind the shed/chicken coop where they kept an old washing machine.  According to Mr. Vuyanich, as the Supervisors walked around the shed, they had to touch it to keep their balance.  There were "private property signs" but no "no trespassing" signs in the area.  Plaintiffs were near the Supervisors when they entered the property, and they never asked the Supervisors to stop or leave the property.  As the Supervisors exited the property the same way they entered, Mr. Vuyanich said "hello."  (ECF No. 135, pp. 9-12); (ECF No. 149, pp. 18-22).

On May 28, 2020, after a non-jury trial at Court of Common Pleas of Westmoreland County Docket Number CP-65-CR-0003869-2018, Mr. Vuyanich was found guilty of a misdemeanor public nuisance charge.  He was sentenced to two years' supervised probation and ordered to pay $5,100.00 in restitution to Smithton Borough.  (ECF No. 135, p. 13); (ECF No. 149, p. 24).

## II.   STANDARD OF REVIEW

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R.

8

Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The Court must view the evidence presented in the light most favorable to the nonmoving party.  *Id.* at 255.  It refrains from making credibility determinations or weighing the evidence.  *Id.*  "[R]eal questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof" will defeat a motion for summary judgment.  *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).  "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining for each side whether a judgment may be entered in accordance with the Rule 56 standard.'"  *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 2016)).[5]

### III.   ANALYSIS

**A. The South Huntingdon Defendants' Motion for Summary Judgment will be granted in its entirety.**

> **1. *Summary judgment will be entered in favor of South Huntingdon Township as to Count I.***

To obtain relief under 42 U.S.C. § 1983, Plaintiffs must make a two-prong showing: (1) that they suffered a violation of a right secured by the Constitution and laws of the United States; and (2) that the alleged deprivation was committed by a person acting under the color of state law.

---

[5] A motion for partial summary judgment is reviewed under the same standard as a motion for full summary judgment.  *Pettengill v. United States*, 867 F. Supp. 380, 381 (E.D. Va. 1994).  "Partial" refers to less claims than all, not less than all elements within a particular claim.  A court cannot grant a motion for partial summary judgment on a particular fact or element of a claim.  *Franklin-Mason v. Penn*, 259 F.R.D. 9, 11 (D.D.C. 2009).

*See Karns v. Shanahan*, 879 F.3d 504, 520 (3d Cir. 2018) (citations omitted).  Plaintiffs allege that South Huntingdon Township violated their Fourteenth Amendment right to procedural due process.  The Fourteenth Amendment prohibits a state actor from depriving "any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV.  Thus, Plaintiffs must demonstrate that (1) they were deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to them did not provide "due process of law."  *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).

The liability of a municipality under § 1983 is governed by *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  Under *Monell*, a municipality cannot be subjected to liability solely because its agents or employees caused injury to another person.  *Id.*  Rather, a municipal entity may be liable under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" deprives a citizen of constitutional rights.  *Id.* at 694.  An official policy may be established under three circumstances: (1) the municipal entity adopted and promulgated a policy, the implementation of which caused the constitutional deprivation; (2) the policymaker failed to act affirmatively even though the need to take some action is obvious and the inadequacy of the existing practice is likely to result in the violation of constitutional rights; or (3) absent a formal policy, an official with policymaking authority violated federal law, causing the constitutional deprivation.  *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003).

### a. Plaintiffs have failed to establish a violation of their rights under the Fourteenth Amendment.

The Due Process Clause's procedural protections apply when a person is deprived of a property interest protected by state law.  *See Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564,

569, 577 (1972). "A fundamental requirement of due process is the opportunity to be heard ... at a meaningful time and in a meaningful manner." *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 417 (3d Cir. 2008) (quotation marks and citation omitted). Thus, procedural due process typically requires that the government afford an individual pre-deprivation process in the form of some notice and an opportunity to be heard before it can deprive him of property. *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971). Pre-deprivation process is not required, however, when the deprivation results from a "random, unauthorized act by a state employee, rather than an established state procedure," and "a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 532-33 (1985).

This is not a situation involving a legal error by a local administrative body. Plaintiffs treated their property as a junkyard, and since 2002 they were subjected to numerous ordinance actions and/or private criminal complaints pursued by South Huntingdon Township. (ECF No. 135, p. 3); (ECF No. 149, p. 3); (ECF No. 141, p. 1); (ECF No. 146, p. 1). Smithton Borough also pursued approximately fifty court actions against Plaintiffs in the course of six to eight years. (ECF No. 135, p. 4); (ECF No. 149, p. 4). Here, the alleged deprivation of Plaintiffs' property occurred by authorization of Judge Feliciani of the Court of Common Pleas of Westmoreland County at Docket Number CP-65-CR-0003869-2018 after Smithton Borough instigated criminal proceedings against Mr. Vuyanich. The record is clear that Plaintiffs were given advance notice and an opportunity to be heard prior to Smithton Borough's court authorized cleanup of their property.

Five status conferences were held before Judge Feliciani at Docket Number CP-65-CR-0003869-2018 where the state of Plaintiffs' property was repeatedly discussed. South Huntingdon Defendants never participated in the status conferences. During the January 10, 2019 status

conference, the Westmoreland County assistant district attorney stated that she was attempting to obtain a monetary grant to assist Mr. Vuyanich with cleaning the property. At an April 9, 2019 status conference, Mr. Vuyanich's attorney explained that Mr. Vuyanich was incapable of cleaning the property himself and that he was willing to cooperate. Judge Feliciani continued the case for another sixty days on the condition that Mr. Vuyanich "with whatever help he's getting, will abate the problem that's persisted since 2014 or earlier." (ECF No. 135, p. 7); (ECF No. 149, p. 10). At a June 18, 2019 status conference, Judge Feliciani recognized that Smithton Borough had been trying to get the properly cleaned "for months, if not longer." Judge Feliciani ordered that Mr. Vuyanich had twenty days to remove the items he wanted to keep from his vehicles, and, after twenty days, Smithton Borough was authorized to remove the vehicles "or whatever else is on the property." Judge Feliciani issued a written order following the conference authorizing Smithton Borough to clean the property. (ECF No. 135, p. 8); (ECF No. 149, p. 12); (ECF No. 138-14).

Although Mr. Vuyanich now claims that he was not notified that a request for cleanup of his property would be made at the June 18, 2019 status conference, that he was not given the opportunity to call or cross-examine witnesses, that he was not given the opportunity to oppose the cleanup, that he was not told items were going to be permanently taken away, and that no civil action was filed against him (ECF No. 149, p. 14; ECF No. 148, pp. 12-14), the Court finds that the pre-deprivation process satisfied due process requirements as a matter of law. At no point during the June 18, 2019 status conference did Mr. Vuyanich, or his counsel, lodge any objections to the court-ordered cleanup. In fact, throughout the duration of his criminal case at Docket Number CP-65-CR-0003869-2018, the record reveals that counsel for Mr. Vuyanich repeatedly represented that Mr. Vuyanich was willing to cooperate.

Furthermore, there were several post-deprivation remedies available. "[T]he focus in procedural due process claims is on the adequacy of the remedial procedure, and not on the government's actual actions that allegedly deprived the individual of his liberty or property interest." *Giuliani v. Springfield Twp.*, 726 F. App'x 118, 122 (2018) (quoting *K.S.S. v. Montgomery Cnty. Bd. of Comm'rs*, 871 F.Supp.2d 389, 397-98 (E.D. Pa. 2012)). "[A] state provides constitutionally adequate procedural due process when it provides reasonable remedies to rectify a legal error by a local administrative body." *Id.* (citing *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 597 (3d Cir. 1995), *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington, PA*, 316 F.3d 392 (3d Cir. 2003)). Most obviously, Mr. Vuyanich could have filed a motion for reconsideration of Judge Feliciani's June 18, 2019 order under Pennsylvania Rule of Criminal Procedure 575. Then, at the September 5, 2019 status conference, which was two months after the cleanup commenced on June 9, 2019, Judge Feliciani was notified that "95 percent of the property on Smithton Borough in the right of way is cleaned up." (ECF No. 138-15, p. 3). At no point did either of Mr. Vuyanich's attorneys lodge objections to the cleanup or removal of certain property. All that was said by them was that a "lawsuit" might be filed "with regard to property that was removed from his land." (*Id.* at 4-5). Additionally, there were other remedies available under Pennsylvania law to Plaintiffs. They could have filed a "Return of Property Petition" under Pennsylvania Rule of Criminal Procedure 588,[6] a replevin claim, or perhaps even a claim under the Municipalities Authorities Act ("the Refund Act"), 72

---

[6] *See In re $300,000 in United States Currency*, 259 A.3d 1051 (Pa. Commw. 2021) (explaining that Pennsylvania Rule of Criminal Procedure 588 allows an individual to file a civil action against the government to obtain the return of his property "regardless of whether the Commonwealth has filed criminal charges or a forfeiture action"). Notably, the Third Circuit has ruled that Rule 588(A) is an adequate procedural remedy that satisfies due process. *See McKenna v. Portman*, 538 F. App'x 221, 224-25 (3d Cir. 2013).

13

P.S. § 5566b, which entitles a party to a refund for improper payments made to a political subdivision of Pennsylvania. There is nothing to suggest these post-deprivation processes were inadequate. Instead, Plaintiffs abandoned this process entirely and filed suit in this Court on October 18, 2019 – fifteen days after the cleanup of the property ceased – and well before the resolution of CP-65-CR-0003869-2018 (it was not until May 28, 2020, that Mr. Vuyanich's non-jury trial occurred). "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." *Alvin v*, 227 F.3d at 116 (citing *McDaniels v. Flick*, 59 F.3d 446, 460 (3d Cir. 1995)). A plaintiff who fails to avail himself of available due process procedures cannot claim abridgement of his due process rights. *Id.* at 116. Because Plaintiffs "failed to take advantage of the available process, [they have] not demonstrated a violation of the Due Process Clause of the Fourteenth Amendment and thus cannot maintain a successful § 1983 action in federal court." *Elsmere*, 542 F.3d at 424.

Plaintiffs have failed as a matter of law to establish that the procedures available to them were inadequate. For these reasons, summary judgment will be entered in favor of South Huntingdon Township as to Count I. *See Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) ("It is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim.").

### b. *Plaintiffs have failed to advance a Monell claim against South Huntingdon Township.*

There must be a violation of Plaintiffs' constitutional rights for a claim under *Monell* against the South Huntingdon Township to proceed. *Johnson v. City of Phila.*, 975 F.3d 394, 403 n.13 (3d Cir. 2020). As noted in the previous section, Plaintiffs have failed to allege a constitutional violation. Thus, their derivative *Monell* claim fails as a matter of law. *See*

14

*Mulholland*, 706 F.3d at 238.   Nonetheless, the Court will address the *Monell* claim given its unusual nature.

Plaintiffs' *Monell* claim is based either on South Huntingdon Township's decision to "surrender jurisdiction to Smithton to charge Plaintiffs for legal violations related to the [p]roperty constitutes an official municipal policy," (ECF No. 1, p. 24), or, that "South Huntingdon delegated its policymaking authority to Smithton over the Property" (ECF No. 140, p. 10) and then it "further delegated law enforcement policymaking power (including South Huntingdon's 'jurisdiction' over the Property) to Chief Natale" (*Id*. at 13).   Plaintiffs argue that the "claim of municipality policymaking demonstrates that South Huntingdon caused a violation of Plaintiffs' procedural due process rights.   (*Id*.).

"If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it ... represents an act of official government 'policy' as that term is commonly understood." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Typically, a municipal policy is "a 'statement, ordinance, regulation, or decision officially adopted and promulgated by [a local governing] body's officers.'" *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1059 (3d Cir. 1991) (alteration in original) (quoting *Monell*, 436 U.S. at 690). However, "municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id*. at 481.   Whether a particular official has final policymaking authority for the purposes of § 1983 liability is a question of state law. *Kelly v. Borough of Carlisle*, 622 F.3d 248, 264 (3d Cir. 2010).

The difficulty in this case is that Plaintiffs are attempting to argue that South Huntingdon Township's policymaking authority was delegated to Smithton Borough and then delegated to its official (Chief Natale).   This is an unusual application of the delegation of policymaking authority.

To begin with, a very fine line exists between delegating final policymaking authority to an official, for which a municipality may be held liable, and entrusting discretionary authority to that official, for which no liability attaches.  An incomplete delegation of authority will not result in municipal liability, whereas an absolute delegation of authority may result in liability on the part of the municipality.  *Brennan v. Norton*, 350 F.3d 399, 428 (3d Cir. 2003) ("[I]f a municipal employee's decision is subject to review, even discretionary review, it is not final and that employee is therefore not a policymaker for purposes of imposing municipal liability under § 1983."); *see also Hill*, 455 F.3d at 245 (3d Cir. 2006) ("In order to ascertain if an official has final policy-making authority, and can thus bind the municipality by his conduct, a court must determine (1) whether, as a matter of state law, the official is responsible for making policy in the particular area of municipal business in question, and (2) whether the official's authority to make policy in that area is final and unreviewable.").

The Court holds that the letter exchanged between the two municipalities' solicitors is insufficient under Pennsylvania law to constitute any sort of cooperation agreement between the municipalities.  Both municipalities' solicitors acknowledged as much in their deposition testimony.  (ECF No. 138-29, pp. 5-13); (ECF No. 147-1, pp. 3, 5-8).

The Pennsylvania Constitution defines a "municipality" as a "county, city, borough, incorporated town, township or any similar general purpose unit of government which shall hereafter be created by the General Assembly."  Pa. Const. art. IX, § 14.  By acts of its governing body, initiative, or referendum, a Pennsylvania municipality may agree to cooperate with another municipality (or other governmental unit) with respect to any of its functions, powers, or responsibilities.  Article IX, Section 5 provides:

> A municipality by act of its governing body may, or upon being required by initiative and referendum in the area affected shall, cooperate or agree in the

exercise of any function, power or responsibility with, or delegate or transfer any function, power or responsibility to, one or more other governmental units including other municipalities or districts, the Federal government, any other state or its governmental units, or any newly created governmental unit.

Pa. Const., art IX, § 5. The Pennsylvania General Assembly, through its passage of the Intergovernmental Cooperation Act, 53 Pa.C.S. §§ 2301–2317 (the "ICA"), established formal rules of compliance for intergovernmental cooperation. Section 2303 of the ICA authorizes said cooperation and provides that it shall be effectuated by joint agreements with other governmental entities:

> **(a) General rule.**--Two or more local governments in this Commonwealth may jointly cooperate, or any local government may jointly cooperate with any similar entities located in any other state, in the exercise or in the performance of their respective governmental functions, powers or responsibilities.
>
> **(b) Joint agreements.**--For the purpose of carrying the provisions of this subchapter into effect, the local governments or other entities so cooperating shall enter into any joint agreements as may be deemed appropriate for those purposes.

53 Pa.C.S. § 2303 (emphasis in original). Section 2305 further provides that any agreement for intergovernmental cooperation necessitates that the governing body of the municipality must pass an ordinance with respect to said agreement. It states:

> **(a) Ordinance or resolution.**--A local government may enter into intergovernmental cooperation with or delegate any functions, powers or responsibilities to another governmental unit, local government or authority as defined in section 5602 (relating to definitions) upon the passage of an ordinance or resolution by its governing body. If mandated by initiative and referendum in the area affected, the local government shall adopt such an ordinance or resolution.

53 Pa.C.S. § 2305(a).[7] Any such ordinance or resolution must include seven specific items of agreement:

---

[7] Plaintiffs plead that South Huntingdon Township is a second class township. A board of supervisors consisting of three members is a second class township's governing body. *See* 53 P.S.

The ordinance or resolution adopted by the governing body of a local government entering into intergovernmental cooperation or delegating or transferring any functions, powers or responsibilities to another local government, an authority as defined in section 5602 (relating to definitions) or to a council of governments, consortium or any other similar entity shall specify:

(1) The conditions of agreement in the case of cooperation with or delegation to other local governments, the Commonwealth, other states or the Federal Government.

(2) The duration of the term of the agreement.

(3) The purpose and objectives of the agreement, including the powers and scope of authority delegated in the agreement.

(4) The manner and extent of financing the agreement.

(5) The organizational structure necessary to implement the agreement.

(6) The manner in which real or personal property shall be acquired, managed, licensed or disposed of.

(7) That the entity created under this section shall be empowered to enter into contracts for policies of group insurance and employee benefits, including Social Security, for its employees.

53 Pa.C.S. § 2307. Finally, a cooperation agreement is deemed to be in force (and enforceable)

only after its adoption by ordinance or resolution by all of the cooperating governmental units. 53

Pa.C.S. § 2315.

---

§ 10107; *see also* 53 P.S. § 65601; 53 P.S. § 65402(a). The municipal codes contain procedural requirements for the governing body of a municipality to enact ordinances that include, among other things, advertising the proposed ordinance in advance of the meeting at which the ordinance will be considered and making copies of the proposed ordinance available for public inspection. *See* 8 Pa. C.S. §§ 3301.1 to 3301.7 (Borough Code); 53 P.S. §§ 65101 to 68701 (Second Class Township Code). An ordinance must follow certain procedural requirements pertaining to the method and manner of its adoption to be denoted as such. Statutory procedures for enactment of ordinances are mandatory and are strictly applied, *Messina v. East Penn Twp.*, 62 A.3d 363 (Pa. 2012); if the municipality fails to comply with such requirements, courts may declare an ordinance invalid.

The ICA deals with durational agreements to permit municipalities to work together on a regular and ongoing basis over time.   As the Pennsylvania Supreme Court explained in *Commonwealth v. Hlubin*, 208 A.3d 1032 (Pa. 2019), of cooperative police operations,

> Any suggestion that the ICA does not require joint agreements between participating municipalities to permit ongoing cooperation between their police departments ignores the reality that one of the core "functions, powers and responsibilities" of local municipal governments is the provision of police services to their citizen.  53 Pa. C.S. §2303.  When two or more municipalities decide to cooperate with each other in the provision of such services to their respective citizenry, an ICA agreement, adopted by ordinance by each of the member municipalities, is required.  53 Pa.C.S. § 2305.  The ordinance of each municipal governing body must reflect its local control over the precise nature of the cooperation with the other municipalities, as it must include agreement with regard to duration, purposes and objectives, financing and the organizational structure necessary to implement the cooperation agreement.  53 Pa. C.S. § 2307.

*Id.* at 1043 (internal footnote omitted).[8]

The actions of Smithton Borough on Plaintiffs' property, including any property removal that may have inadvertently occurred on the portion that fell in South Huntingdon Township due to the contractors' uncertainty about boundary lines, were not authorized pursuant to an ICA agreement with South Huntingdon Township.  The governing bodies of the two municipalities could have passed ordinances reflecting their understanding and agreement to permit Smithton Borough to participate in enforcement activities (including the prosecution of Plaintiffs) on the

---

[8] The Municipal Police Jurisdiction Act, 42 Pa.C.S. §§ 8951–8954 ("MPJA"), provides that a police officer may perform the functions of his office anywhere within his primary jurisdiction, but Section 8953(a) extends the authority of police officers to exercise their official police duties outside their primary jurisdiction in only six specific and limited circumstances.  Section 8953(e) of the MPJA specifically references "cooperative police servicing agreements with another municipality."  42 Pa.C.S. § 8953(e).  This section speaks to the authority of municipalities to enter into cooperation with other municipalities of the type envisioned in the ICA.  "[S]ection 8953(e) may fairly be read to indicate that cooperative relationships between municipalities with respect to the provision of police services require compliance with the ICA unless authorized by one of the six exceptions in section 8953(a)."  *Hlubin*, 208 A.3d at 1044.

portion of the property located in South Huntingdon Township. This did not occur. No exhibits have been proffered that the two municipalities actually passed any ordinances. Thus, there is no evidence of record that South Huntingdon Township legally intended its governmental authority to be transferred/delegated to Smithton Borough. All that can be gathered from the record is that South Huntingdon Township (through a letter from its solicitor) acquiesced to Smithton Borough pursing criminal charges against Plaintiffs as to the portion of the property in Smithton Borough and for Smithton Borough to do so through its police officers and contractors. What occurred was not a policy decision by South Huntingdon Township to surrender its jurisdiction over to Smithton Borough, or a delegation of South Huntingdon Township's policymaking authority to Smithton Borough (and then to Chief Natale). The Court holds that no legally viable evidence exists that South Huntingdon Township cooperated in a joint prosecution of Mr. Vuyanich with Smithton Borough or the cleanup of Plaintiffs' property. Plaintiffs' *Monell* claim fails as a matter of law. Summary judgment will be entered in favor of South Huntingdon Township as to Count I.[9]

### 2. Summary Judgment will be entered in favor of South Huntingdon Defendants as to Count IV.

According to Plaintiffs, South Huntingdon Defendants violated the Fourth Amendment in two ways: (1) "they entered and searched the curtilage area of the Property (within fifty feet of Plaintiffs' dwelling in the area between their dwelling and shed)"; and (2) they "searched" and "inspected" Plaintiffs' "effects" – i.e., they "walked through the South Huntingdon portion of the

---

[9] The South Huntingdon Defendants also argue that if Plaintiffs wanted to recover directly from South Huntingdon Township, they should not have released South Huntingdon Township's alleged agent and policymaker, Chief Natale. Plaintiffs have stated that the Smithton Defendants and South Huntingdon Defendants are not joint tortfeasors. (ECF No. 107, pp. 5-9). Therefore, the South Huntingdon Defendants are of the position that under Pennsylvania law the release of the claim against an agent terminates the derivative claim against the principal. (ECF No. 137, pp. 14-15). Given the Court's holding, it will not decide the merits of this argument.

Property with Cooper to view Plaintiffs' personal items lying there," and they "touched Plaintiffs' shed." (ECF No. 148, p. 17). "The first step in Fourth Amendment analysis is to identify whether a search or seizure has taken place." *United States v. Hartwell*, 436 F.3d 174, 177 (3d Cir. 2006). The Court finds that as a matter of law no search occurred, and Count IV fails.

The Fourth Amendment protects people's right "to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures ..." *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 209 (3d Cir. 2001). The Fourth Amendment's "'central requirement' is one of reasonableness." *Illinois v. McArthur*, 531 U.S. 326, 330 (2001) (quoting *Texas v. Brown*, 460 U.S. 730, 739 (1983)). "[R]easonableness is generally assessed by carefully weighing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Cnty. of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 427 (2017) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).

The heightened Fourth Amendment's protection afforded to homes extends to a home's curtilage—the area "immediately surrounding and associated with the home," *Collins v. Virginia*, _____U.S. __, 138 S. Ct. 1663, 1670 (2018) (internal quotation marks omitted) (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)), and "intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened," *California v. Ciraolo*, 476 U.S. 207, 213 (1986). "[T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *United States v. Dunn*, 480 U.S. 294, 307 (1987) (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)). The question of the extent of curtilage is essentially factual. *United States v. Benish*, 5 F.3d 20, 24 (3d Cir. 1993). There are four factors relevant to the curtilage inquiry: "[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within

21

an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." *Dunn*, 480 U.S. at 301. The "central component of the inquiry [i]s whether the area harbors intimate activity associated with the sanctity of a man's home and the privacies of life." *Id.* (citation omitted).

First, the Court considers the proximity of the area claimed to be curtilage to the home. The dilapidated shed was located 50 to 75 yards from Plaintiffs' dwelling. It was separated from the dwelling by a barrier of junk, and there was junk strewn in and around the shed. Portions of the shed were missing and the inside was clearly visible. (ECF No. 135, p. 12); (ECF Nos. 138-34, 138-35, 138-36). The Court finds that the first factor weighs against a finding that area where the shed was located constitutes curtilage.

Second, the Court considers whether the area is included within an enclosure surrounding the home. In no way was the shed connected to the home. And, given its deteriorating state, the shed itself was not sufficiently enclosed. Thus, the second factor weighs against the Court finding that area where the shed was located is curtilage.

Third, the Court considers the nature of the area's usage. There were no signs (e.g., "no trespass," "keep out," or "big dog") anywhere in that area of the property. (ECF No. 68, p. 29). The shed itself was filled with junk as well as the surrounding area. Absolutely no evidence was adduced in discovery to support an inference that the area was an extension of the daily intimate activities of the home. The Court finds that the third factor weighs against a finding that the area where the shed was located is curtilage.

Fourth, the Court considers the steps taken to protect the area from observation by people passing by. Nothing about the area precluded curious neighbors, members of the public, or government agents from entering and viewing the property. The area at issue was easily accessible

by a public road, and Smithton Borough agents were authorized to be on the property conducting the court-ordered cleanup.   Plaintiffs treated their property as a junkyard, and since 2002 they were subjected to numerous ordinance actions and/or private criminal complaints pursued by South Huntingdon Township.   (ECF No. 135, p. 3); (ECF No. 149, p. 3); (ECF No. 141, p. 1); (ECF No. 146, p. 1).  At some point, South Huntingdon Township stopped pursing actions related to Plaintiffs' property.  (ECF No. 135, p. 4); (ECF No. 149, p. 3).  Smithton Borough also received frequent complaints about the state of Plaintiffs' property, and in the course of six to eight years, Smithton Borough pursued approximately fifty court actions against Plaintiffs.  (ECF No. 135, p. 4); (ECF No. 149, p. 4).  Given all this, it defies credulity that the area where the shed was located was intended to be protected.  In fact, on the date the Supervisors entered the property,  Plaintiffs were near the Supervisors.  Plaintiffs never asked the Supervisors to stop or leave the property.  As the Supervisors exited the property the same way they entered, Mr. Vuyanich said "hello."  (ECF No. 135, pp. 9-12); (ECF No. 149, pp. 18-22).  Thus, the Court finds that the fourth factor weighs against a finding that the area is curtilage.

On balance, the Court holds that the portion of Plaintiffs' property at issue was not intimately linked to the home and, therefore, not curtilage.  The Supervisors did not enter the home's curtilage; they did not physically intrude into a constitutionally protected area.  Count IV fails as a matter of law.

Furthermore, if "an item left in plain view" is observed, there is no Fourth Amendment search.  *Brown*, 460 U.S. at 738 n.4 (1983); *accord Horton v. California*, 496 U.S. 128, 133 n.5 (1990).  This is because "a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the plain view of outsiders are not protected because no intention to keep them to himself has been exhibited." *Katz v. United States*, 389 U.S.

Case 2:19-cv-01342-WSS   Document 154   Filed 06/28/23   Page 24 of 26

347, 361 (1967) (Harlan, J., concurring) (internal quotation marks omitted). If "there has been no invasion of a legitimate expectation of privacy," and an object is left in open view and observed from a lawful vantage point, then there is no " 'search' within the meaning of the Fourth Amendment." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). The plain view doctrine applies to observations of environmental code violations on a person's property. *See e.g., Singhal v. City of Wilton Manors*, No. 06-cv-61653, 2006 WL 8433166, at *3 (S.D. Fla. Dec. 14, 2006) (citing *Katz* and noting that "observations made from vantage points accessible to the public of code violations exposed to the plain view are not covered by the Fourth Amendment").

Smithton Borough's court-approved cleanup of the property was well underway when it invited South Huntingdon Township supervisors to see its cleanup efforts. It cannot be disputed that South Huntingdon Township had an interest in promoting the health and safety of its township. *See* 53 P.S. § 65607 (under the Pennsylvania Second Class Township Code, the board of supervisors shall exercise its powers to "secure the health, safety and welfare of the citizens of the township." 53 P.S. § 65607); *see also* 53 P.S. § 66529 (authorizing the board of supervisors to prohibit nuisances by ordinance). The South Huntingdon Supervisors – Jennewine, Gates, and Seglowich – decided to visit Plaintiffs' property, and did so on September 27, 2019. They walked over a trail/driveway connected to Walnut Lane, a public road, and stood near Plaintiffs' shed/chicken coop for fifteen to twenty minutes. Plaintiffs were near the Supervisors when they entered the property, and they never asked the Supervisors to stop or leave the property. As the Supervisors exited the property the same way they entered, Mr. Vuyanich said "hello." (ECF No. 135, pp. 9-12); (ECF No. 149, pp. 18-22). All the Supervisors did was observe the state of property and items left in plain view, including the junk inside the shed as it was clearly visible due to the shed's dilapidated condition. Plaintiffs have presented no evidence that the South Huntingdon

Defendants observed anything on their property other than items left in plain view.  Plaintiffs lack a reasonable expectation of privacy in such items.  That the Supervisors may have touched the shed for balance as they walked around it is immaterial.

The evidence adduced in discovery does not touch upon the applicable tenets of a viable Fourth Amendment claim.  There is an absence of a genuine dispute.  No search occurred on September 27, 2019.  Summary judgment will be entered in favor of the South Huntingdon Defendants as to Count IV.[10]

### c.  Plaintiffs' Motion for Partial Summary Judgment

As the Court is granting South Huntingdon Township's motion as to Count I and entering summary judgment in its favor, Plaintiffs' Motion for Partial Summary Judgment as to Count I will be denied.

## IV.   CONCLUSION

For the foregoing reasons, the South Huntingdon Defendants' Motion for Summary Judgment will be granted, and Plaintiffs' Motion for Partial Summary Judgment will be denied. Summary judgment will be entered in favor of South Huntingdon Township at Count I, and in

---

[10] There must be a violation of Plaintiffs' constitutional rights for a claim under *Monell* against the South Huntingdon Township Defendants to proceed.  *Johnson*, 975 F.3d at 403 n.13.  Since Plaintiffs failed to allege a constitutional violation, their derivative *Monell* claim fails as a matter of law.  *See Mulholland*, 706 F.3d at 238.  However, the Court would note that Plaintiffs failed to adduce evidence in discovery that the South Huntingdon Defendants instituted a policy which violated their Fourth Amendment rights.

favor of South Huntingdon Township, Supervisor Eddie Troup, Supervisor Matthew Jennewine, and Supervisor Richard Gates at Count IV.  Orders of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

6/28/23
Date